UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ASHLEY BENEDICT,

    Plaintiff,

v.

STATE OF MICHIGAN, MICHIGAN
DEPARTMENT OF CORRECTIONS,
THUMB CORRECTIONAL FACILITY,
WILLIAM RHULMAN, LORI GIDLEY,
and FRANK BERNSTEIN,

    Defendants.
_____/

Case No. 14-13668

HON. AVERN COHN

## MEMORANDUM AND ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 57, 59)[1]

### I. Introduction

This is an employment and 42 U.S.C. § 1983 civil rights case. Plaintiff Ashley Benedict is suing defendants[2] the State of Michigan, the Michigan Department of Corrections, the Thumb Correctional Facility, William Rhulman, Lori Gidley, and Frank Bernstein making claims under state and federal law related to her employment with the

---

[1]Upon review of the parties' papers, the Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

[2]Benedict initially also sued the MDOC and named all the individual defendants in their official and individual capacities. The MDOC and all official capacity claims were subsequently dismissed on stipulation of the parties. (Doc. 12). Benedict also initially sued Teresa Peiffer, a corrections officer, and David Bergh, the Warden at TCF. Following motions to dismiss by defendants, her claims against Peiffer and Bergh were dismissed. (Doc. 25). Benedict was later granted leave to file the Second Amended Complaint which added Title VII claims against the State of Michigan, the MDOC, and TCF following exhaustion under Title VII. See Doc. 34.

Michigan Department of Corrections (MDOC) at Thumb Correctional Facility (TCF). Rhulman is proceeding pro se. Gidley is the Deputy Warden at TCF. Bernstein is a corrections officer.

The Second Amended Complaint asserts the following claims:

Count I: Violation of the Michigan ELCRA – Hostile Work Environment (all defendants)

Count II: Violation of the Michigan ELCRA – Disparate Treatment (all defendants)

Count III: Violation of the Michigan ELCRA – Unlawful Retaliation for Engaging in a Protected Activity (all defendants)

Count IV: Equal Protection Violation under 42 U.S.C. § 1983 (14th Amendment) (Bernstein, Gidley, and Rhulman)

Count V: Substantive Due Process Violation under 42 U.S.C. § 1983 (14th Amendment) (Bernstein, Gidley, and Rhulman)

Count VI: Violation of Title VII - sex discrimination - against State of Michigan, MDOC and TCF

Count VII: Violation of Title VII - hostile work environment - against State of Michigan, MDOC, and TCF

Count VIII: Violation of Title VII - retaliation - against State of Michigan, MDOC and TCF

Before the Court is the State of Michigan, MDOC, TCF, Gidley and Bernstein's motion for summary judgment (Doc. 59) and Rhulman's motion for summary judgment (Doc. 57). For the reasons that follow, Benedict's claim against Bernstein for an Equal Protection violation under Count IV is DISMISSED. Benedict's substantive due process claim under Count V is also DISMISSED. The case continues on Counts I, II, and III, IV (against only Rhulman and Gidley), VI, VII, and VIII.

## II. Background

The material facts as gleaned from the record follow.[3]

Benedict, a female, began working for the MDOC on March 12, 2006. She received good performance reviews and held the position of Resident Unit Officer in the Exxex Unit. Rhulman was her supervisor. According to the deposition testimony of Kenneth McCall, a retired employee of the MDOC who worked with Benedict and Rhulman, Rhulman was favored by Gidley.

Beginning in 2009 and for years, until April 22, 2012, Benedict says she was sexually harassed by Rhulman. Rhulman would send sexually explicit e-mails, Facebook messages, and text messages. The record contains some of the messages sent by Rhulman to Benedict which are sexual in nature. Rhulman also requested sexual favors, which Benedict says she expressly opposed. In one particular incident, on September 23, 2011, Rhulman sent Benedict a picture of his genitals in a text message. Rhulman testified at deposition that the behavior was consensual.

---

[3]The motion papers leave much to be desired. Rhulman's pro se motion lacks any supporting exhibits and essentially says that Benedict is lying. The MDOC defendants' motion is essentially a recitation of governing law and makes virtually no attempt to tie the law to the facts in the record. Moreover, some of the claims are discussed in terms of Benedict not pleading a plausible claim under 12(b)(6) when the motion is clearly under Rule 56. While the MDOC defendants filed a statement of material facts and attached 12 exhibits, the exhibits are not highlighted and consist primarily of documents from Benedict's employment file such as discipline reports which Benedict does not dispute exists. The MDOC defendants proffered no deposition testimony. Benedict responded to the statement of facts and the parties filed a joint statement. (Doc. 66). Benedict also filed three (3) large binders of exhibits which are mostly duplicative and not highlighted. They consist of exhibits in response to both motions (Docs. 61, 63) and exhibits in response to the MDOC defendant's statement of facts (Doc. 64). Be that as it may, the record is sufficient to enable a decision on the motions.

In addition to written correspondence, Benedict says that Rhulman would verbally harass her on a regular basis. In the Fall of 2012, for example, Rhulman called Benedict into his office after she informed him she was upset because a close friend had died. Rhulman replied that he had keys to every room and would "make her feel better." Benedict refused and left his office and reported the incident to her work partner at the time, corrections officer Floyd Fuller. She also told Fuller that Rhulman was becoming increasingly vulgar in his messages and pictures to her. Fuller allegedly advised Benedict to report the matter to Bernstein, who was Benedict's Lieutenant. It does not appear that Benedict reported the incident and Rhulman's behavior to Bernstein at this time.

After the Fall of 2012 incident, Benedict was transferred from the Exxex Unit to the Cord Unit. Although the date of the transfer is not clear from the record, Benedict says it was "immediately after" the Fall 2012 incident. In the Cord Unit, Benedict held a rover position where she assisted other corrections officers. Benedict was told by Bernstein that Rhulman directed the transfer because she allegedly was not doing enough shake downs and not taking enough contraband out of the inmates houses (Benedict denies this). Rhulman, however, testified that it was Gidley's decision to transfer Benedict but admitted he had the authority to recommend transfers and that he discussed Benedict's transfer with Gidley.

Benedict's partner in the Cord Unit was McCall, who was also a union representative prior to his retirement. He testified that he would have been upset being transferred as Benedict was because such transfers are not common. McCall also testified that Rhulman remained in contact with Benedict after the transfer, including

4

speaking to inmates in the Cord Unit about Benedict. Anther corrections officer that worked with Benedict in the Cord Unit, Kendra Patillo, testified that she believed Benedict was transferred because of Rhulman and that she viewed Benedict's transfer as a demotion.

Sometime after the transfer, Benedict reported to Bernstein, her Lieutenant, that Rhulman had been sending her sexual messages and that she believed she was transferred because she would not "make out" with Rhulman as he requested. According to Benedict, Bernstein said to her "don't tell me anymore, I have to report it."

Meanwhile, on December 15, 2012, Benedict was told she would be assigned to the front gate for her shift. Benedict allegedly became upset by the assignment, told her supervisor she was quitting, and left the facility. Benedict also allegedly used inappropriate language at the visitor's desk and nearby visitors. Apparently, Gidley directed the assignment out of a concern for Benedict's safety when a "kite and shank" were found with Benedict's name on it. Benedict, however, alleges the change in assignment was unwarranted and other male employees who were alleged to have been threatened were given an option to transfer to another assignment.

On February 23, 2013, the Warden, David Bergh, recommended a three day suspension for Benedict's conduct on December 15, 2012. Benedict believes the discipline was unfounded and points to McCall's deposition testimony in which he states he was not aware of another employee receiving a three day suspension for similar conduct. McCall also testified that a three day suspension was "pretty suspicious" given Benedict's complaints about Rhulman.

Regarding formal complaints, Benedict filed the following EEO complaints within the MDOC:

On February 26, 2013, Benedict filed a Sexual Harassment complaint against Rhulman in which she stated, "I have three years' worth of unwanted emails from a supervisor that were inappropriate and unwanted. These emails and my lack of responding to them are negatively affecting me at work and causing me unwanted problems."

On March 1, 2013, Benedict filed a complaint for Disparity of Treatment against Rhulman in which she stated, "Because  was removed off my regular assignment without explanation other than there was a shank and letter threatening me. This is not what they have done to male employees who work here who have been threatened by a letter or even seriously assaulted." This relates to the disciplinary incident discussed above in which Benedict received the three day suspension.

On March 1, 2013, Benedict filed a complaint alleging Harassment and Defamation of Character against Rhulman and Gidley in which she stated, "Defendant Rhulman investigated and questioned prisoners in my assignment and concluded I was hanging with 'heavyhitters' of a flint gang. There are also a couple more examples included in this paperwork of harassing incidents."

According to Benedict, she was ever been investigated or in trouble until she began reported the sexual harassment. This allegation appears mostly supported by the record. There is only one disciplinary incident prior to the fall of 2012 when Benedict first began reporting Rhulman's harassment and it is rather insignificant. On

6

July 10, 2012 Benedict was issued a formal notice of counseling for inappropriate use of leave credits. After the Fall of 2012, Benedict has the following disciplinary incidents:

February 15, 2013, as noted above, Benedict received a three day suspension for becoming very upset on December 15, 2012 after she had learned that she had been assigned to the front gate for the shift.

On February 23, 2013, Benedict was alleged to not responding to a radio call from a shift supervisor and then becoming upset and yelling at Sgt. Moore and Captain Peiffer. She received a five day suspension on March 1, 2013 as a result. Like the three day suspension, McCall also testified that he did not agree with this discipline and testified that Benedict should have never received a five day suspension as he is aware of more than this going on every day at MDOC and nobody gets disciplined for it.

On October 13, 2013, Benedict did not immediately report a misdemeanor ticket for driving with a suspended license. She received an eight day suspension on May 27, 2014. Benedict says that other MDOC employees have had more serious charges/tickets and were never suspended.

On November 24, 2013, Benedict was reported for using profanity while in the Pedestrian Gates. She received a six day suspension on January 22, 2014.

Almost a year later, on October 14, 2014, Benedict was terminated for not reporting police contact within 24 hours. Apparently, on July 26, 2014, Benedict was ticketed again for driving with a suspended license and plates and for no proof of insurance. She reported the incident to the MDOC on July 30, 2014. Benedict says that other MDOC employees failed to timely report more severe charges and received

7

15 or 30 day suspensions, not terminations. Benedict also says that she reported the ticket as soon as possible as it was received on a weekend and the Inspector to whom she was to report the ticket, did not work weekends.[4]

### III.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot  produce admissible evidence to support a fact.

---

[4]Benedict sought unemployment benefits following her termination.  Her case went to a hearing before an administrative law judge (ALJ).  Benedict received a favorable decision upon the ALJ's conclusion that the MDOC failed to present sufficient evidence to demonstrate statutory misconduct.  See Benedict's Ex. O - decision of ALJ.  Notably, the ALJ found:
> The claimant received a disciplinary action in July 2014 for failure to report a previous ticket to Inspector Smith.  There was no policy or procedure as to what the claimant was to do regarding a ticket received on the weekend.  The claimant made efforts to report the July 28, 2014 ticket to Inspector Smith as soon as practicable as he did not work on the weekends.  The employer failed to present sufficient evidence to demonstrate statutory misconduct under the Act.

Fed. R. Civ. P. 56(c)(1).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).

### IV.  Analysis

### A.  Title VII and Elliot Larsen Claims

As noted above, Benedict has asserted claims under Title VII of the Civil Rights Act and Michigan's Elliott-Larsen Civil Rights Act (ELCRA) against defendants for (1) gender discrimination, (2) creation of a hostile work environment, and (3) retaliation. The ELCRA claims are asserted against the individual defendants - Rhulman, Bernstein, and Gidley.  The Title VII claims are against the State of Michigan, MDOC and TCF.

Because ELCRA is substantially modeled after Title VII, her claims under both statutes will be analyzed together using the McDonnell Douglas burden-shifting analysis as Benedict has not proferred direct evidence to support her claims.  Radkte v. Everett, 442 Mich. 368, 381-382 (1993); McDonnell Douglas Corp. v. Green, 411 US 792 (1973) and reaffirmed in Texas Dept. of Cmty Affairs v. Burdine, 450 US 248 (1981).

Under the McDonnell Douglas burden-shifting analysis, the plaintiff has the initial burden of presenting her prima facie case.  The establishment of her prima facie case then creates a rebuttal presumption that requires defendants to articulate a legitimate,

9

nondiscriminatory reason for their adverse employment actions. If defendants meet their burden, plaintiff must show that the proffered reason for their adverse employment actions against her was a pretext for discrimination.

### 1. Title VII and ELCRA - Prima Facie Case - Gender Discrimination

A prima facie case gender discrimination requires a showing that: (1) she was a member of a protected class; (2) adverse employment action was taken against her; (3) she was qualified for the position; and (4) she was treated differently than similarly-situated male employees. Vredevelt v. GEO Group, Inc., 145 F. App'x 122 (2005).

Here, Benedict is a female and therefore a member of the protected class so the first element is satisfied. As to the second element, an adverse employment action as "more than a 'mere inconvenience or an alteration of job responsibilities,' and 'must have an objective basis for demonstrating that the change is adverse, rather than the mere subjective impressions of the plaintiff.'" Vredevelt at 128 quoting Meyer v. City of Center Line, 242 Mich. App. 560 (Mich. Ct. App. 2002) (citing Wilcoxon v. Minnesota Mining & Mfg. Co., 235 Mich. App. 347, (Mich. Ct. App. 1999). Moreover, Michigan Courts have identified a "materially adverse" employment action to include the following: "termination of employment; demotion evidenced by a decrease in wage or salary; a less distinguishable title; a material loss of benefits; significantly diminished material responsibilities; or other indices that might be unique to a particular situation." Id. quoting Wilcoxon, 597 N.W.2d at 258. Furthermore, the Sixth Circuit has held that a job transfer to a more arduous position can be an adverse employment action even though her pay and benefits remained the same. White v. Burlington Northern & Santa Fe Rey,

364 F.3d 789, (6th Cir. 2003) citing Kocsis v. Multi-Care Mgmt. Inc., 97 F.3d 876, 886 (6th Cir. 1996); Mattei v. Mattei, 126 F.3d 794, 808 (6th Cir. 1997) (stating that transferring an employee at the same salary to 'some wretched backwater' is 'clearly' actionable in a retaliation claim).

Benedict says she suffered endured the following adverse employment action by defendants: (1) transferred from the Essex Unit to Cord Unit by Gidley, upon the recommendation of Rhulman, where she was a rover that assisted her fellow corrections officers in which she transfer was viewed by her coworkers as a demotion, a discipline, and offensive. (2) transferred from the Cord Unit to the front gate by Gidley where she had no inmate contact and was denied a significant amount of overtime; (3) suspended four separate times without pay, and (4) terminated on October 14, 2014.

Defendants do not appear to challenge whether Benedict suffered an adverse employment action as they do not argue the issue in their brief. Nor do defendants challenge whether Benedict was qualified for her position as a corrections officer as corroborated by her supervisors and co-workers.

Defendants, do challenge whether Benedict has put forth evidence to establish whether she was treated differently than her male corrections officers at TCF. To demonstrate that an individual is a "similarly situated" comparator, a plaintiff is simply "required to prove that all of the relevant aspects of [her] employment situation were 'nearly identical' to those of [the male employees'] employment situation." Ercegovich v. Goodyear Tire & Rubber Co, 154 F.3d 344, 352 (6th Cir. 1998) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)). For example, "similarly situated" in the disciplinary context means that, "the individuals with whom the plaintiff

seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). However, "the weight to be given to each factor can vary depending upon the particular case." Johnson v. Kroger Co., 319 F.3d 858, 867 (6th Cir. 2003) (citing Ercegovich, 154 F.3d at 352). "Courts should not assume ... that the[se] specific factors ... are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." Ercegovich, 154 F.3d at 352.

Here, Gidley testified that she transferred Benedict from the Cord Unit to the front desk due to her safety as Benedict was allegedly threatened by an inmate in the form of a shank included in a letter to her. However, McCall testified that he was aware of a male corrections officer - Terry Boltwright - who had a "similar threat against him" and was not transferred. Mickey Terry, another corrections officer, testified that he knew of male employees at TCF who have been threatened by inmates, where one in particular was physically assaulted by an inmate, who were given the decision to transfer. Terry identified Officer Alcorn and Officer Gooch as the male corrections officers. Defendants do not address this evidence in their briefs. Additionally, McCall testified that he was aware of male employees who committed significant crimes and were not suspended let alone terminated as was Benedict. McCall specifically said that he was aware of two male officers who have received multiple DUIs and filed a false police report and neither

12

were terminated. While admittedly Benedict could have made the record clearer as to the similarities between her and the corrections officers identified by McCall, it appears that they are sufficiently similar in terms of job title (corrections officer), supervisor (Gidley), and similar conduct (as described by McCall). As such, Benedict has satisfied the similarly situated element.

Overall, Benedict has made out a prima facie case for gender discrimination sufficient to survive summary judgment.

### 2. Title VII and ELCRA - Prima Facie Case - Retaliation

To establish a prima facie case of retaliation under Title VII and ELCRA, Benedict must show: (1) she engaged in activity protected by the statute; (2) her exercise of protected rights was known to defendants; (3) defendants thereafter took adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse action. Hafford v. Seidner, 183 F.3d 506, 515 (6th Cir. 1999); DeFlaviis v. Lord & Taylor, Inc., 223 Mich. App. 432 (1997). Moreover, Title VII and ELCRA prohibit retaliation against an employee for complaining about discrimination. See 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees…because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."); M.C.L. § 37.2701 (a) (making it unlawful to "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a

13

complaint, testified, assisted or participated in an investigation, proceeding, or hearing under this act.").

Here, Benedict engaged in protected activity under Title VII and ELCRA when she verbally reported Rhulman's sexual harassment to Bernstein, Warden Bergh, and subsequently filed three EEO discrimination complaints against Gidley and Rhulman on February 26, 2013 and March 1, 2013. Moreover, Defendants were aware of her EEOC complaints shortly after they were filed. Gidley was also aware of the complaints as she confirmed this at her deposition. Contrary to Defendants' argument, there is substantial evidence that Defendants retaliated against Benedict, by transferring her, suspending her several times without pay, and subsequently terminating her only after she reported the sexual harassment and filed her EEO complaints.

Defendants argue that Benedict cannot show a causal connection. This requirement may be satisfied by showing a close timing between the adverse action and the protected activity. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008). Here, Benedict had a positive job performance evaluation in December of 2012 (approximately 2 months before she filed her EEO complaints). After she orally reported the sexual harassment against Rhulman in the Fall of 2012, she was subjected to her first significant disciplinary action for an incident occurring on December 15, 2012. In February 2013, she filed her first formal complaint. After that, she received 3 additional suspensions without pay and was eventually terminated. Although the termination came 20 months after her engaging in protected activity, from the time line of disciplinary actions her outlined in detail above, a reasonable juror could find a causal

connection between Benedict's protected activity and the adverse employment actions, up to an including termination.

As such, Benedict has made out a prima facie case of retaliation sufficient to survive summary judgment.

### 3. Title VII and Elliot Larsen - Hostile Work Environment - Prima Facie Case

In order to establish a claim of hostile work environment, the plaintiff must prove the following elements by a preponderance of the evidence: (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; (3) the employee was subjected to unwelcome sexual conduct or communication; and (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment. Chambers v Trettco, Inc, 463 Mich 297; 614 NW2d 910 (2000). Given that Rhulman was Benedict's supervisor at the time of the sexual harassment, Benedict does not have to meet the element of respondeat superior element as Defendants erroneously argue in their Brief. See Burlington Indus v. Ellerth, 524 US 742 (1998); Faragher v. City of Boca Raton, 524 US 775 (1998).

The only element at issue is whether Benedict was sexually harassed, i.e. subjected to a hostile work environment. "In order to establish a hostile work environment [under the PWDCRA and Title VII], courts ask 'whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment.' " Mazur v. Wal-Mart Stores, Inc., 250 F. App'x 120, 127-128 (6th Cir. 2007) (quoting Quinto v.

Cross & Peters Co., 547 N.W.2d 314, 320 (Mich. 1996)). "Courts must examine the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether — taken together — the reported incidents make out such a case." Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999).

As set forth above, Rhulman repeatedly sexually harassed Benedict in the form of a picture text message of his genitals, lewd Facebook messages, voicemails that he was masturbating, and multiple verbal requests to engage in sexual acts with him. While Rhulman denies that the communications were unwelcome, his bold assertions are insufficient to warrant summary judgment in his favor. While defendants contend that Rhulman's conduct does not rise to the level of sexual harassment, the Court finds that reasonable minds could differ as to whether Benedict was subjected to a hostile and offensive work environment. Despite defendants' argument to the contrary, a reasonable juror could find that Rhulman's conduct towards Benedict was so pervasive that it altered the conditions of her employment and created an abusive situation.

Defendants also argue that Gidley and Bernstein cannot be held liable because they had "nothing to do with the alleged sexual harassment." (Doc. 59 Pg ID 479). At this stage in the case, the record contains evidence that Bernstein furthered the hostile work environment by refusing to stop it as he told Benedict to stop telling him about it or he would have to report it. Gidley also furthered the hostile work environment by failing to keep Rhulman from Benedict. After Benedict was involuntarily transferred to the

Cord Unit, Gidley allowed Rhulman to keep in contact with Benedict as he unnecessarily attended a personnel meeting and spoke with inmates about Benedict. Notably, Rhulman was never disciplined in any manner even though Warden Bergh testified that Rhulman's actions were sexual harassment, inappropriate, and he should have been disciplined. Gidley had the authority to initiate an investigation against Rhulman for his actions but did not.

Accordingly, Benedict has satisfied her prima facie burden as to Title VII hostile work environment claim against Defendant State of Michigan, MDOC, and TCF as well as her ELCRA claim against Gidley and Bernstein.

### 4. All Claims - Legitimate Reason and Pretext

Even assuming defendants' proffered reason for Benedict's termination - that she failed to report a ticket - was legitimate, the question is then whether Benedict has produced evidence that the reason was a pretext for discrimination and in retaliation for her protected activity. To demonstrate pretext in this context, "a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." Ford Motor Co., 782 F.3d at 767 (emphasis in original). "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful retaliation in fact was." Id.

To show pretext, Benedict points to McCall's deposition testimony in which he testified that witness, McCall, who unequivocally testified that the "progressive discipline" that Benedict received by Defendants is "pretty suspicious" and was probably influenced by the fact that she filed charges against Defendant Rhulman. (Benedict's

17

Ex. A, pp. 46-47). In particular, McCall testified that Benedict's disciplines, which began with a 3 day suspension, started out higher than normal and her suspensions in his view were excessive. McCall also identified other male employees with greater offenses and crimes that received nothing compared to Ms. Benedict—let alone termination. (Ex. A, pp. 25-26, 28, 42-48).

From the record, reasonable minds could differ on whether Benedict's performance was the true reason for her termination or whether it was a pretext for gender discrimination and/or retaliation. As such, Benedict's claims go forward.

### B. 14th Amendment Due Process and Equal Protection Claims - Bernstein, Rhulman, and Gidley[5]

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspected class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." Rondigo, L.L.C. v. Township of Richmond, 641 F.3d 673, 681–82 (6th Cir.2011). Here, Benedict alleges that she was a target of discriminatory treatment because she is a member of a suspect class.

"[I]n order to establish a prima facie case, the plaintiff must set forth the following elements: 1) he was a member of a protected class; 2) he was subject to an adverse employment action; 3) he was qualified for the job; and 4) for the same or similar

---

[5]Benedict did not address her equal protection claim against Bernstein in her response. Her failure to respond results in a waiver of opposition. Count IV must therefore be dismissed against Bernstein. Additionally, Benedict offers no argument on her substantive due process claim under Count V. As such, Count V is dismissed in its entirety.

18

conduct, he was treated differently from similarly situated [non-female] employees." Perry v. McGinnis, 209 F.3d 597, 601 (6th Cir.2000).

As discussed above Benedict and has produced evidence from which a reasonable juror could find she was discriminated against because of her membership in this class and in retaliation for her protected activity and was treated differently than her male counterparts.

As to Rhulman, the evidence of his conduct, examined in their most favorable light, are sufficient to make out a prima facie equal protection violation against Rhulman.

Regarding Gidley, as referenced above and supported by the evidence, Benedict says that Gidley favored males and specifically treated her unfavorably due to her gender. She also says that Gidley engaged in a pattern of favoritism of male correction officers including, her friend Rhulman. Moreover, Benedict points out that Gidley had the authority to recommend an investigation be initiated as to whether a work rule has been violated by an employee, but failed to instigate any kind of investigation against Rhulman even though she was aware of the sexual harassment allegations against him. Based on these facts, Benedict has made out a prima facie Equal Protection Claim against Gidley.

Furthermore, Gidley is not entitled to the defense of qualified immunity. Putting aside that Gidley provided virtually no argument on this issue, there is at least a question as to whether a reasonable person would have known that they were violating Benedict's Fourteenth Amendment rights in the manner in which Gidley treated Benedict.

## V. Conclusion

For the reasons stated above, the State of Michigan, TCF, Gidley and Bernstein's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Count IV, equal protection, against Bernstein is DISMISSED. Count V is DISMISSED. Rhulman's motion for summary judgment is DENIED. The case continues on Counts I, II, and III (Elliot Larsen Claims), and Count IV against Gidley and Rhulman. The case continues against the State of Michigan, MDOC, and TCF on Counts VI, VII, and VIII (Title VII claims).

SO ORDERED.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: September 19, 2017
Detroit, Michigan